**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

```
-------------------------------------------------------x
                                       :
WENDY ALBERTY                          :        3:20-CV-1014 (JCH)
                                       :
v.                                     :
                                       :
ROBERT A. HUNTER,                      :
STEPHEN J. SAMSON, and                 :
DANIEL DEPTULA                         :        DATE: NOV. 17, 2022
                                       :
-------------------------------------------------------x
```

**RULING AND ORDER ON THE PLAINTIFF'S MOTION TO QUASH**
**AND MOTION TO COMPEL**

This is an action for compensatory and punitive damages in which the plaintiff, Wendy

Alberty ("Alberty" or the plaintiff), alleges that the defendants, Trooper Robert A. Hunter

("Hunter"), Sergeant Stephen J. Samson ("Samson"), and Master Sergeant Daniel W. Deptula

("Deptula") (collectively, the defendants), violated her civil rights after arresting and charging her

in connection with an incident in which a bus passenger was locked in the luggage compartment

of a passenger bus Alberty had been operating.  It is brought pursuant to 42 U.S.C. § 1983, the

First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, as well as both

common law tenets and Connecticut statutory provisions.

Before the Court is the plaintiff's motion to quash a third-party subpoena, (Doc. No. 37),

and the plaintiff's motion to compel the defendants to respond to certain discovery requests.  (Doc.

No. 42).  The defendants have opposed both motions.  (*See* Doc. Nos. 44, 54).

For the reasons discussed below, the plaintiff's motion quash (Doc. No. 37) is

**DISMISSED as MOOT** and the plaintiff's motion to compel (Doc. No. 44) is **GRANTED in**

**part** subject to the limitations discussed below.

1

I.      BACKGROUND AND PROCEDURAL HISTORY

The Court assumes the parties' familiarity with the facts alleged in the plaintiff's second amended complaint ("SAC") (Doc. No. 59) and the parties' briefing on the motion to compel.  (*See* Doc. Nos. 42-1 (Pl's Br.) and 54 (Def's Br.)).  Thus, the Court provides only a summary of the facts relevant to the resolution of the instant motions.

In 2019, and at all relevant times, the plaintiff was employed as a driver for Peter Pan Bus Lines ("Peter Pan"), and the defendants were officers of the Connecticut State Police, Troop C, and acting under that authority.  (SAC ¶¶ 6-9, 10).

On August 4, 2019, the plaintiff was operating a passenger bus for Peter Pan, departing from Manhattan, New York, en route to Boston, Massachusetts.  (SAC ¶ 11).  The bus briefly stopped at Union Station in Hartford, Connecticut, to change drivers.  (SAC ¶ 12).  During the stopover, a passenger asked the plaintiff if she could retrieve an item from her bag inside the large luggage compartment, under the bus.  (SAC ¶ 13).  The plaintiff acquiesced, opened the luggage compartment door and went on to engage in a conversation with a coworker while the second driver scheduled to drive the leg from Hartford to Boston began pre-trip safety checks.  (SAC ¶¶ 14-15).

Though accounts diverge from here, both parties agree to the following basic facts.  While the plaintiff was engaged in conversation with her coworker, the passenger fully entered the luggage compartment and the compartment door was shut on her, trapping her below the main passenger cabin.  Alberty then boarded the bus to continue the trip to Boston as a passenger while the second driver took over, and the bus resumed its trip with the passenger trapped underneath.  (SAC ¶¶ 16-18; Doc. No. 54 at 1-2).  The passenger dialed 911, and the bus was pulled over by

2

Trooper Hunter who informed the bus driver that Connecticut State Police Troop C dispatch had received a 911 telephone call from a female passenger, stating that she was locked in the luggage compartment of a Peter Pan bus. (SAC ¶ 19). Sergeant Samson then arrived on the scene, took command, and the passenger was freed from the luggage compartment uninjured. (*Id.*).

At this point, Hunter and Samson interviewed the second bus driver, the passenger and the plaintiff. (SAC ¶ 25; Doc. No. 54 at 2). The passenger alleged that the plaintiff had purposefully locked her in the luggage compartment. (SAC ¶ 22). The plaintiff adamantly maintained that she had not intentionally or knowingly locked the passenger in the luggage compartment. (SAC ¶ 24). Nonetheless, Trooper Hunter and Sergeant Samson arrested the plaintiff for breach of peace and reckless endangerment. (SAC ¶ 23).[1]

At about the same time as the troopers were conducting their investigation of the incident by the roadside, the State Police had dispatched Trooper Gonzalez[2] to Union Station to determine whether any surveillance footage of the incident existed. Shortly after the plaintiff's arrest, Trooper Hunter and Sergeant Samson received word, through dispatch, that Trooper Gonzales had reviewed the surveillance footage, and it appeared to show that the plaintiff had indeed not locked the passenger in the luggage compartment intentionally. (SAC ¶¶ 20-21; Doc. No. 42-1 at 2).

The defendants state in their briefing that, following the arrest, Trooper Hunter compiled his Investigation Report, which contained documentation from the incident, including, as relevant here, several "NCIC printouts." (Doc. No. 54 at 2; *see* SAC ¶ 26; *see also* Doc. No. 54-1). The National Crime Information Center ("NCIC") "database is maintained by the FBI and aggregates

---

[1] The plaintiff was ultimately charged with (1) unlawful restraint in the first degree, in violation of Conn. Gen. Stat. § 53a-95; (2) reckless endangerment in the second degree, in violation of Conn. Gen. Stat. § 53a-64; and (3) breach of the peace, in violation of Conn. Gen. Stat. § 53a-181. However, as part of her claims here, the plaintiff alleges that the count of unlawful restraint was added maliciously and as a direct result of her invocation of her Fifth Amendment rights in refusing to provide a written statement to the defendants. (*See* SAC ¶¶ 26-32).

[2] Trooper Gonzales is not a party to this action.

criminal justice information from a variety of sources." *Comm'r of Correction v. Freedom of Info. Comm'n*, 307 Conn. 53, 58, 52 A.3d 636, 640 (2012). "Some files in the database contain information about individual persons and are known as person files. Other files contain records regarding stolen property. Law enforcement agencies routinely check NCIC records to obtain information concerning persons in custody or under investigation." *Id.* In aggregate, these are often referred to criminal history records information ("CHRI").

*     *     *

On July 20, 2020, the plaintiff filed a complaint against Trooper Hunter and Sergeant Samson alleging claims of false arrest, malicious prosecution, and retaliatory prosecution.[3] (Doc. No. 1). On July 19, 2021, the Court (Covello, J.) denied the defendants' motion to dismiss on all counts, and, in November 2021, the parties commenced discovery. (*See* Doc. Nos. 28, 42-2).

On February 21, 2022, the plaintiff moved to quash a third-party subpoena issued by the defendants to the plaintiff's former employer, Peter Pan. (Doc. No. 37). On March 9, 2022, the plaintiff moved to compel the defendants to respond to two requests for production and a related interrogatory, discussed further below, involving: (1) records from criminal history databases—namely NCIC, COLLECT (the Connecticut On-Line Law Enforcement Communications Teleprocessing system), and NLETS (the National Law Enforcement Telecommunications System)—"that were available to them and reviewed by them while they were determining whether they had probable cause to arrest Plaintiff," and (2) the defendants' entire disciplinary records. (Doc. No. 42). The defendants opposed both motions. (Doc. Nos. 44, 54).

---

[3] On September 16, 2020, the Court (Covello, J.) granted the plaintiff's motion to file an amended complaint. (Doc. No. 8). On May 10, 2022, the Court granted leave to amend the complaint to include as a defendant Master Sergeant Deptula, for his alleged involvement in adding the retaliatory charge of unlawful restraint. (Doc. No. 58).

4

On October 4, 2022, the Court (Hall, J.) referred both motions to the undersigned. (Doc. No. 69). On October 14, 202, this Court held a discovery conference with the parties and instructed them to meet and confer to attempt to the resolve the outstanding issues in the motions. (Doc. No. 73). The Court also ordered the parties to submit a joint status report explaining what issues remained, if any. (*See id.*).

On October 28, 2022, the parties submitted the joint status report. (Doc. No. 74). The parties reported that they had met and conferred and resolved the motion to quash as the "Plaintiff, through counsel, has withdrawn her objections to Defendants' Subpoena directed to Peter Pan Bus Lines, Inc., and therefore the Motion to Quash and Opposition thereto are moot." (*Id.*). Accordingly, the Court **DISMISSES as MOOT** the plaintiff's motion to quash the subpoena. (Doc. No. 37).

However, the parties submitted that the following two issues in the plaintiff's motion to compel, (Doc. No. 42), require resolution by the Court: (1) whether the defendants must disclose the four pages of NCIC records about the plaintiff attached to the Investigation Report, and (2) the proper scope of the defendants' disciplinary records that must be disclosed. The Court now resolves these issues.

## II.   LEGAL STANDARDS

### A.   The Scope of Discovery under Rule 26(b)

"[T]he scope of discovery is broad." *McCarroll v. Nardozzi*, No. 3:96CV00124 (AVC), 2004 WL 7333640, at *2 (D. Conn. Oct. 13, 2004). The "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." FED. R. CIV. P. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." *Id.* "The touchstone of Fed. R. Civ. P. 26(b)(1) is

relevance[.]" *Compudyne Corp. v. Shane*, 244 F.R.D. 282, 283 (S.D.N.Y. 2007). "Information that is reasonably calculated to lead to the discovery of admissible evidence is considered relevant for the purposes of discovery." *Tucker v. Am. Int'l Grp., Inc.*, 281 F.R.D. 85, 91 (D. Conn. 2012) (citing *Daval Steel Prods. v. M/V Fakredine,* 951 F.2d 1357, 1367 (2d Cir.1991)). *See Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S. Ct. 2380, 2389, 57 L. Ed. 2d 253 (1978) (explaining that relevancy under Rule 26 "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." (citing *Hickman v. Taylor*, 329 U.S. 495, 501, 67 S.Ct. 385, 388, 91 L.Ed. 451 (1947))).

"When a party files a motion to compel, it bears the initial burden to show the relevance of the information it seeks." *Huseby, LLC v. Bailey*, No. 3:20-CV-00167 (JBA), 2021 WL 3206776, at *6 (D. Conn. July 29, 2021). After this burden has been met, the "party resisting discovery [then] bears the burden of showing why discovery should be denied." *Cole v. Towers Perrin Forster & Crosby*, 256 F.R.D. 79, 80 (D. Conn. 2009). "Put differently, the moving party must make 'a *prima facie* showing of relevance,' after which 'it is up to the responding party to justify curtailing discovery.'" *Huseby*, No. 3:20-CV-00167 (JBA), 2021 WL 3206776, at *6 (quoting *Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 325 F.R.D. 36, 48 (E.D.N.Y. 2018)).

"All '[m]otions relative to discovery,' including motions to compel, 'are addressed to the discretion of the [district] court.'" *Mercer v. Rovella*, No. 3:16-CV-329 (CSH), 2022 WL 1514918, at *3 (D. Conn. May 12, 2022) (quoting *Soobzokov v. CBS*, 642 F.2d 28, 30 (2d Cir. 1981)). "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." *Id.* (quoting *Crawford-El v. Britton*, 523 U.S. 574, 598, 118 S. Ct. 1584, 1597, 140 L. Ed. 2d 759 (1998)) (internal quotation marks omitted). *See*

*also Dauphinais v. Cunningham*, 395 F. App'x 745, 746-47 (2d Cir. 2010) ("[T]he federal rules give district courts broad discretion to manage the manner in which discovery proceeds, and we review discovery rulings for abuse of discretion." (citations and internal quotation marks omitted)).

### B.      Probable Cause

Establishing that a defendant acted without probable cause is an element for false arrest, malicious prosecution, and retaliatory prosecution claims brought pursuant to § 1983.  *See Chase v. Nodine's Smokehouse*, *Inc.*, 360 F. Supp. 3d 98, 112-13 (D. Conn. 2019) (applying Connecticut law and setting out standard for false arrest and malicious prosecution claims); *Mozzochi v. Borden*, 959 F.2d 1174, 1180 (2d Cir. 1992) (setting out standard for malicious prosecution under the First Amendment).  "The existence of probable cause is a complete defense to claims of false arrest and malicious prosecution under both federal and Connecticut law."  *Chase*, 360 F. Supp. 3d at 112 (citing *Williams v. Town of Greenburgh*, 535 F.3d 71, 78-79 (2d Cir. 2008)).  "It will also defeat a First Amendment claim that is premised on the allegation that defendants prosecuted a plaintiff out of a retaliatory motive."  *Fabrikant v. French*, 691 F.3d 193, 215 (2d Cir. 2012).

Probable cause for an arrest "requires an officer to have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  *Id.* at 214.  "Courts evaluating probable cause for an arrest must consider those facts available to the officer at the time of the arrest and immediately before it."  *Id*. (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)).

## III.   DISCUSSION

### A.      NCIC Records Regarding the Plaintiff

In production Request No. 10, the plaintiff seeks:

Any and all C.I.R. reports, case/incident reports, internal affairs records, Detective Bureau records, medical records, accident records, wagon records, booking records,

cell block records, etc., concerning plaintiff, any defendant or the subject matter of this lawsuit.

(Doc. No. 42-1 at 3).

However, the parties agree that through their efforts to meet and confer, they have narrowed the issue to five pages of records from NCIC, COLLECT, and LETS databases which were attached to the Investigation Report. Four of these pages have been withheld by the defendants. (*See* Doc. No. 42-1 at 3-5, 7; Doc. No. 54 at 3). A declaration proffered by the defendants states that the four pages of unproduced records "were generated from" the COLLECT/NCIC system and that three of them have an identical DMV record which "contains information regarding Ms. Alberty's driver's license."[4] (*See* Doc. No. 54-1, ¶¶ 5-7). One withheld page, however, is an "NCIC record, which confirms the existence or nonexistence of a federal criminal record." (*Id.* at ¶ 8).

The defendants' arguments against producing these pages are twofold. First, they maintain that two federal statutes—the National Crime Prevention and Privacy Compact (the "Compact"), 42 U.S.C. § 14616, and 28 U.SC. § 534—prevent their disclosure. Second, they claim that, in any case, the withheld NCIC records are irrelevant. (*See* Doc. No. 54 at 3-7). The Court takes these arguments in reverse order because, if the plaintiff has not met her burden of establishing that such records are relevant, *see Huseby*, No. 3:20-CV-00167 (JBA), 2021 WL 3206776, at *6, there is no need to reach the question of whether federal law prohibits their disclosure.

---

[4] The declaration is signed by Versie Jones, the Criminal Justice Information Systems Officer for Connecticut's Department of Emergency Services and Public Protection; Ms. Jones is responsible for the access, use, dissemination, auditing, and training of United States Federal Bureau of Investigation (FBI) CJIS Systems and data for the State of Connecticut. (Doc. No. 54-1, ¶ 2).

### 1.      Relevancy

The plaintiff contends that the NCIC records are relevant because the information contained within them—*i.e.*, her potential criminal history that was included in page three of the withheld documents—was available to the defendants at the time of her arrest and go to "crucial" question of whether they had or lacked probable cause to arrest her and, in particular, whether the defendants made the decision to arrest her based on information not related to the passenger's allegations.  (Doc. No. 42-1 at 7; *see* Doc. No. 54-1, ¶ 8).  As stated above, demonstrating a lack of probable cause is a key element to each of the plaintiff's claims here *and* an absolute defense for the defendants.  *See Chase v. Nodine's Smokehouse*, *Inc.*, 360 F. Supp. 3d at 112-13; *Mozzochi*, 959 F.2d at 1180; *Fabrikant v. French*, 691 F.3d at 215.  The defendants' brief also makes it clear that Trooper Hunter had access to the NCIC criminal record information prior to when a decision was made to arrest the plaintiff.[5]  (Doc. No. 54 at 6).    Thus, the withheld NCIC records are arguably relevant to the plaintiff's claims because they may bear on, and lead to, other admissible evidence as to whether the plaintiff's arrest was substantiated by probable cause.

The defendants rejoin that the records are irrelevant because (1) at the defendants' depositions none of them testified that her criminal history was a consideration in deciding to arrest her and (2) the "defendants have no intention of arguing that the plaintiff's criminal history (or lack of) served as the basis for her arrest."  (Doc. No. 54 at 6).  Rule 26(b)'s reach, however, "has been construed broadly to include any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case" regardless of what is said in a

---

[5] The defendants state, "Trooper Hunter's body camera indicates that they never accessed the actual criminal record information prior to arresting the plaintiff, but rather, the dispatcher communicated the results of the query to Trooper Hunter." (Doc. No. 54 at 6).  They further state that the footage shows that dispatch did not find anything "negative." (*Id.*).  But Rule 26 simply requires that the evidentiary "matter" sought be nonprivileged, relevant, and proportional to a claim or defense and does not put limitation on from where that information may be sought. FED. R. CIV. P. 26(b). The defendants also do not dispute that the information transmitted to Trooper Hunter came from the NCIC records at issue and was later attached to the Investigation Report.

deposition.  *El Badrawi v. Dep't Of Homeland Sec.*, 258 F.R.D. 198, 201 (D. Conn. 2009) (citation and internal quotation marks omitted).  *See Martino v. Nationstar Mortg. LLC*, No. 17-CV-1326 (KAD), 2019 WL 2238030, at *1 (D. Conn. May 23, 2019) (explaining that "[r]elevance for discovery purposes is an extremely broad concept").  And the defendants may very well be impeached on this deposition testimony at trial, perhaps using the very information that is contained in withheld NCIC records.  Moreover, a party seeking discovery of relevant and nonprivileged documents need not demur to an opposing party's assurance that they do not intend to argue a certain theory or defense to avoid its discovery obligations.  "Rather, the party seeking discovery is entitled to obtain the discovery and draw its own conclusions as to the documents' usefulness."  *El Badrawi*, 258 F.R.D. at 201.

As the plaintiff has demonstrated that the NCIC records are relevant to the issue of probable cause, they should be disclosed unless they are privileged, or the defendants can otherwise shoulder "the burden of showing why discovery should be denied."  *Cole*, 256 F.R.D. at 80.

### 2.    Whether Federal Law Bars Disclosure of the NCIC Records

As an initial matter, the defendants do not "expressly" claim anywhere in their briefing that the NCIC records are privileged.  *See* Fed. R. Civ. P. 26(b)(5)(A) (explaining that "[w] hen a party withholds information otherwise discoverable by claiming that the information is privileged . . . the party must *expressly* make the claim" (emphasis added)); (Doc. No. 42-2, ¶ 6).  *See also El Badrawi v. Dep't Of Homeland Sec.*, 258 F.R.D. 198, 203-06 (D. Conn. 2009) (examining NCIC records and the qualified "law enforcement privilege" in the Rule 26(b) motion-to-compel context).  Nor do the defendants pursue any arguments that producing the NCIC records would be overly burdensome, disproportional, expensive, or otherwise outside the scope of Rule 26.  Thus, the Court does not address these considerations.

Instead, the defendants argue that the NCIC records concerning the plaintiff are "protected by law." (Doc. No. 54; Doc. No. 42-2, ¶ 6). Specifically, the defendants contend that two interrelated federal statutes governing the exchange and dissemination of CHRI bar their disclosure.

First, the defendants contend that the Compact, 34 U.S.C. § 40316,[6] which Connecticut participates in, protects the records from disclosure because the Compact only allows the NCIC database "to be used for limited purposes authorized by law, such as background checks, and that NCIC records may only be used for official purposes." (Doc. No. 54 at 4). Second, they argue that 28 U.S.C. § 534, which regulates the dissemination of FBI compiled "rap sheets" and other CHRI, also prohibits disclosure. Relatedly, the defendants contend that to allow production of the records here would put Connecticut's participation in the Compact at risk of cancellation by the Attorney General. (*Id.* at 4-5).

### a.    The Compact

In 1998, Congress enacted the Crime Identification Technology Act of 1998, PL 105–251, which established the Compact. The Compact "organizes an electronic information sharing system among the Federal Government and the States to exchange criminal history records for noncriminal justice purposes authorized by Federal or State law, such as background checks for governmental licensing and employment." 34 U.S.C. § 40316(a). Pursuant to the Compact, "the FBI and the Party States agree to maintain detailed databases of their respective criminal history records, including arrests and dispositions, and to make them available to the Federal Government and to Party States for authorized purposes." *Id.* at § 40316(b). "The term 'noncriminal justice purposes' means uses of criminal history records for purposes authorized by Federal or State law

---

[6] While the defendants' brief cites to the statute as previously codified at 42 U.S.C. § 14616, this codification was transferred effective September 1, 2017, to 34 U.S.C. § 40316.

other than purposes relating to criminal justice activities, including employment suitability, licensing determinations, immigration and naturalization matters, and national security clearances." *Id.* at Art. I(18).   In turn, the term "criminal justice" includes:

> activities relating to the detection, apprehension, detention, pretrial release, post-trial release, prosecution, adjudication, correctional supervision, or rehabilitation of accused persons or criminal offenders. The administration of criminal justice includes criminal identification activities and the collection, storage, and dissemination of criminal history records

*Id.* at (6)

In 2000, Connecticut entered the Compact as a party state through the enactment of General Statutes § 29-164f.[7]   Connecticut Public and Special Acts, P.A. 00-185 (2000).   Both § 29-164f and 34 U.S.C. § 40316 set forth the terms of Connecticut's participation the Compact.

By its own text, the Compact itself does not appear to bar disclosure of the NCIC records in absolute.   The Compact contains ten Articles of which only one, Article IV "Authorized Record Disclosures," is relevant here.   Article IV discusses how CHRI records may be exchanged but only as to the FBI and the participating party states, not third-party individuals.

Subsection (a) mandates that the "FBI shall provide on request criminal history records (excluding sealed records) to State criminal history record repositories for noncriminal justice purposes allowed by Federal statute, Federal Executive order, or a State statute that has been approved by the Attorney General and that authorizes national indices checks." 34 U.S.C. § 40316, Art IV(a).   Similarly, subsection (b) provides that both the FBI and State criminal history record repositories "shall provide criminal history records (excluding sealed records) to criminal justice agencies and other governmental or nongovernmental agencies for noncriminal justice purposes

---

[7] General Statutes § 29–164f provides in relevant part: "The National Crime Prevention and Privacy Compact is hereby entered into and enacted into law with any and all of the states and the federal government legally joining therein . . ."

allowed by Federal statute, Federal Executive order, or a State statute that has been approved by the Attorney General, that authorizes national indices checks." *Id.* at (b). Subsection (c) governs the procedures for these disclosures and states that "[a]ny record obtained under this Compact may be used only for the official purposes for which the record was requested."

Putting these provisions together, and by way of example only, if a school district is considering employing a teacher that district may "request" the candidate's CHRI records, such as fingerprints, to perform a background check, which is an explicitly considered "noncriminal justice purpose" pursuant to subsection (b), assuming there is an authorizing federal or state law allowing so. *See* 34 U.S.C. § 40316(a); *id.* at Art IV(b). That agency, however, may not then use those CHRI records outside that authorized noncriminal justice purpose of an employment suitability check. *Id.* at Art IV(c).

Thus, on its face, there is nothing in the Compact's text discussing or prohibiting the disclosure in the discovery phase of federal civil litigation of records that may have already been "requested" by an authorized party. Indeed, as Connecticut courts have noted, "the [C]ompact does not contain an express prohibition on disclosure[.]" *Comm'r of Pub. Safety v. Freedom of Info. Comm'n*, 144 Conn. App. 821, 827, 76 A.3d 185, 188 (2013); *accord State v. Abushaqra*, No. H12MCR110235121S, 2015 WL 5135109, at *5 (Conn. Super. Ct. July 13, 2015), *aff'd*, 164 Conn. App. 256, 137 A.3d 861 (2016). In fact, the facts here do not appear to even implicate the Compact as the COLLECT/NCIC records "requested" by the defendants at the time the plaintiff's arrest were clearly being used for criminal justice purposes, *i.e.*, "the detection, apprehension, detention . . . of [the] accused person[.]" *Id.* at Art. I(6). This scenario falls squarely outside of the ambit of the Compact.

Indeed, looking to the Compact as a whole, its text, history and purpose is to organize and govern the exchange of CHRI records between "the Federal Government and the States" sought "for noncriminal justice purposes authorized by Federal or State law" rather than to act as a purely prophylactic barrier between the ratifying parties and the public or individual litigants.  34 U.S.C. § 40316(a); *see id.* at (b) (setting out the obligations of the parties as between "the FBI and the Party States"); *id.* at Art. II(1) (stating that a purpose of the Compact is to "provide a legal framework for the establishment of a cooperative Federal-State system for the interstate and Federal-State exchange of criminal history records for noncriminal justice uses").

The legislative history contained in the 1998 congressional floor debates explains:

> The Compact facilitates the interstate and federal-state exchange of criminal history information by clarifying the obligations and responsibilities of participating parties, streamlining the processing of background search applications, and eliminating record maintenance duplication at federal and state levels. Finally, the Compact provides a mechanism for establishing and enforcing uniform standards for record accuracy and for the confidentiality and privacy interests of record subjects. . .

> The Compact is an effort to get the FBI out of the business of holding a duplicate copy of every State and local criminal history record, and instead to keep those records at the State level. Once fully implemented, the FBI will only need to hold the Interstate Identification Index (III), consisting of the national fingerprint file and a pointer index to direct the requestor to the correct State records repository. The Compact would eliminate the necessity for duplicate records at the FBI for those States participating in the Compact.

144 Cong. Rec. S12036-03 (daily ed. Oct. 8, 1998) (statement of Sen. Jeffords), available at 1998 WL 716516.

Given the above, the defendants' argument that the Compact itself acts as bar to disclosing the relevant NCIC records concerning the plaintiff to the plaintiff for the purposes of civil litigation is misplaced as the Compact clearly governs the relationship between Connecticut and the FBI regarding CHRI records requested for noncriminal justice purposes.  It is the conduct, or rather

potential misconduct, of the party states, their agencies, or the FBI in accessing and using CHRI and NCIC data for improper purposes, *i.e.*, those that are *not* "noncriminal justice purposes," that appears to animate the Compact.

Federal law mentioning or construing the Compact is limited.[8]  However, as it pertains to the facts of this case, the Court finds the ruling in *State v. Avery* instructive, even if nonbinding. *See id.*, No. CR16284676, 2017 WL 6273543, at *2 (Conn. Super. Ct. Aug. 16, 2017).  In *Avery* the defendants sought to "compel the state to disclose certain information, claimed to be in the state's possession, in order to prepare a defense to their individual cases." *Id.* at *2.  This information included copies of their prior criminal history held in NCIC records. *Id.*   Like here, the government agency respondents argued that "any dissemination of [] NCIC" records "violates" the Compact. *Id.*  "The flaw in this argument, however," the *Avery* court pointed out, "is that the prohibition regulates the exchange of criminal history records for noncriminal purposes. The court cannot find a prohibition on a prosecutor giving a criminal defendant a copy of his criminal history record, such as a NCIC report or printout." *Id. Accord State v. Wilson*, No. HHB-CR 14-0276060, 2017 WL 4872925, at *2 (Conn. Super. Ct. Sept. 8, 2017) (adopting the same conclusion); *See also In Re Watkins*, 369 S.W.3d 702, 706 (Tx. App. 2012) (opining that, to the extent the State obtained information containing *Brady* material, including from NCIC records, the State was obligated to disclose that information).

---

[8] The Court is aware of only the following limited cases, none of which are apposite or binding here.   *Williams v. Fla.*, No. 20-61134-CIV, 2020 WL 13453299, at *2 (S.D. Fla. Nov. 13, 2020) (involving correction of criminal history record), *reconsideration denied*, No. 20-61134-CIV, 2021 WL 9057665 (S.D. Fla. Aug. 16, 2021); *Knecht v. City of Cincinnati, Ohio*, No. 1:12-CV-763, 2013 WL 3875324, at *4 (S.D. Ohio July 26, 2013) (mentioning the Compact in qualified immunity context), *report and recommendation rejected sub nom. Knecht v. City of Cincinnati*, No. 1:12-CV-00763, 2013 WL 4536886 (S.D. Ohio Aug. 27, 2013);  *Mix v. JPMorgan Chase Bank, NA*, No. CV-15-01102-PHX-JJT, 2016 WL 5850362, at *4 (D. Ariz. Oct. 6, 2016) (discussing Compact in employment termination context); *Barlow v. United States*, No. 3:03-CR-16-FDW-2, 2015 WL 5944156, at *2 n.3 (W.D.N.C. Oct. 13, 2015) (citing to definition section of Compact in a footnote); *United States v. Davis*, 233 F. App'x 944, 946 (11th Cir. 2007) (citing to definition section of Compact in criminal case); *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, 827 F. Supp. 2d 242, 255 (S.D.N.Y. 2011) (citing Compact as evidence of ICE policy shift in a FOIA case).

While *Avery* was a criminal case and the defendants sought their NCIC records pursuant to Connecticut's rules of criminal procedure governing discovery, its principles nonetheless suggest the same conclusion in this case.  Here, the plaintiff seeks NCIC records that are relevant to her own claims (and perhaps the defendants' defenses) pursuant to a federal law authorizing their production, FED. R. CIV. P. 26(b)(1).  These records are not privileged.  The Court cannot find a prohibition under the text, history, or purpose the Compact that bars disclosure of the withheld NCIC records in this case, and the defendants offer no authority to suggest that the Compact bars disclosure.  The defendants simply argue that the terms of the Compact, as codified, provide "that the NCIC computerized database is to be used for limited purposes authorized by law, such as background checks, and that NCIC records may only be used for official purposes." (Doc. No. 54 at 4).  This statement fails to apprehend, as explained above, that the subjects "using" the NCIC database for such limited purposes are the law enforcement officers, not the plaintiff, and the troopers in this case did not access or use the NCIC database for any Compact-related noncriminal justice purpose.

The Court also considers several other factors not raised by the parties, in supporting this conclusion. First, federal regulations promulgated by National Crime Prevention and Privacy Compact Council,[9] do not contain any bar on disclosure as discussed above.  Rather, these rules contain fingerprint submission requirements, 28 C.F.R. § 901, *et seq.*; dispute adjudication procedures, *id.*, at § 902, *et seq.*; State Criminal History Record Screening Standards, *id.*, at § 904, *et seq.*; National Fingerprint File (NFF) Program Qualification Requirements, *id.*, at § 905, *et seq.*; regulations governing the Outsourcing of Noncriminal Justice Administrative Functions *id.*, at §

---

[9] Article VI of the Compact "established a council to be known as the 'Compact Council', which shall have the authority to promulgate rules and procedures governing the use of the III System for noncriminal justice purposes, not to conflict with FBI administration of the III System for criminal justice purposes."  43 U.S.C. § 40316, Art. VI.

906, *et seq.*; and Compact Council Procedures for Compliant Conduct and Responsible Use of the Interstate Identification Index (III) System for Noncriminal Justice Purposes, *id.*, at § 907, *et seq.*

Additionally, Connecticut's statute ratifying the Compact, Conn. Gen. Stat. Ann. § 29-164f, adopts the Compact's language regarding authorized record disclosures verbatim. *See id.*, at Art. IV.

Lastly, the plaintiff here does not herself seek in her discovery requests "direct access" to the NCIC database or terminals to view her records.   *See* 34 U.S.C. § 40316, Art I(10) ("Direct access" means access to the National Identification Index by computer terminal); *Jones v. City of Elkhart*, No. 2:10-CV-402-TLS, 2012 WL 2026327, at *2-3 (N.D. Ind. June 5, 2012) (affirming denial of defendant's motion to compel  "requesting  access to . . .  NCIC [] systems to view electronic reports").

Given the foregoing, the Court concludes that defendants have not carried their burden "of showing why discovery should be denied" based on the Compact alone.  *Cole v. Towers Perrin Forster & Crosby*, 256 F.R.D. 79, 80 (D. Conn. 2009).

**b.      28 U.S.C. § 534**

The Court now turns to determine whether 28 U.S.C. § 534 nonetheless bars disclosure of the withheld NCIC records requested pursuant to Rule 26(b).   (*See* Doc. No. 54 at 3-5).  28 U.S.C. § 534 is found in Title 28 of the U.S. Code, Chapter 33, which concerns the organization and authority of the Federal Bureau of Investigation ("FBI") in the Department of Justice ("DOJ").  In relevant part, § 534 regulates the "acquisition, preservation, and exchange of identification records and information[.]"  *Id.*  Specifically, it mandates that the "Attorney General shall. . . acquire, collect, classify, and preserve criminal identification records, crime, or other records."  *Id.,* § 534(a)(1).  These CHRI records are sometimes more colloquially referred to as "rap sheets."  *See U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 752, (1989) (hereinafter

*Reporters Committee*).  The statute also requires the Attorney General to "exchange these records with, and for the official use of, authorized officials of the Federal Government, the States" and other agencies and institutions. 28 U.S.C. § 534(a)(4).  "The local, state, and federal law enforcement agencies throughout the Nation that exchange rap-sheet data with the FBI do so on a voluntary basis. The principal use of the information is to assist in the detection and prosecution of offenders; it is also used by courts and corrections officials in connection with sentencing and parole decisions." *Reporters Committee*, 489 U.S. at 752.

The statute also provides that "the exchange of records and information authorized by subsection (a)(4) of this section is subject to cancellation if dissemination is made outside the receiving departments." 28 U.S.C. § 534(b).  The defendants argue that the statutory language, accompanying caselaw, and Connecticut's interest in remaining in the Compact precludes the production of the NCIC records to the plaintiff here.  (*See* Doc. No. 54 at 4).  The Court does not agree with any of these contentions.

First, the statutory text does not support a wholesale prohibition on disclosure of NCIC records.  Indeed, federal regulations governing the exchange of CHRI even provide for "procedures by which an individual may obtain a copy of his or her identification record" from the FBI, state or local criminal justice agency.  *See* 20 C.F.R. § 20.34.  Relatedly, federal regulations addressing the dissemination of NCIC CHRI provide that it "may be made available . . . for" *inter alia*, "other uses for which dissemination is authorized by federal law." 28 C.F.R. § 20.33(a)(3).[10]

---

[10] Nowhere in their briefing do the parties address whether any federal regulations apply or bar disclosure.  The Court need not and will not decide an issue not briefed nor before it .  In any case, the Court notes that the Supreme Court of West Virginia concluded that an earlier version of 28 C.F.R. § 20.33 did not "impose an absolute bar to the release of criminal history record information pursuant" to a subpoena issued pursuant the state's civil discovery laws.  *State ex rel. W. Virginia State Police v. Taylor*, 201 W. Va. 554, 563-64, 499 S.E.2d 283, 293 (1997).

Rather, by its own text, § 534(a)(4) simply limits mandatory CHRI exchanges to those that are for the "official use" of the designated "authorized officials."  To ensure that the privacy interests of the subjects of those records are safeguarded, § 534(b) acts as an enforcement device that allows the Attorney General, in his discretion, to cancel "the FBI's exchange of rap-sheet information. . . if dissemination is made outside the receiving departments or related agencies." *Reporters Committee*, 489 U.S. at 765.  As the Supreme Court has stated, "these statutes and regulations, [*i.e.,* 28 U.S.C. § 544,] taken as a whole, evidence a congressional intent to protect the *privacy* of rap-sheet subjects, and a concomitant recognition of the power of compilations to affect personal privacy that outstrips the combined power of the bits of information contained within." *Id.* (emphasis added).  *See* 28 C.F.R. § 20.1 ("It is the purpose of these regulations to assure that criminal history record information wherever it appears is collected, stored, and disseminated in a manner to ensure the accuracy, completeness, currency, integrity, and security of such information and to protect individual privacy.").  *See also State v. Avery*, No. CR16284676, 2017 WL 6273543, at *2 (Conn. Super. Ct. Aug. 16, 2017) (concluding that section 534 "is about the treatment of rap sheets as confidential and restricting their use to governmental purposes, while prohibiting access of rap sheets to the general public").  However, the factual situation at play here is not one that raises the privacy concerns that concerned Congress in enacting § 534 or the Supreme Court in *Reporters Committee*; the plaintiff simply seeks, in discovery in a civil rights action, her own NCIC records which were attached to the police report justifying her arrest. Moreover, as discussed below, disclosing the withheld NCIC records to the plaintiff and her counsel alone, subject to a standard protective order, does not appear to be "dissemination" as contemplated in the statute or Supreme Court precedent.

The defendants also appear to argue that subsection (f)(1) also prohibits disclosure because it creates only a "narrow exception" to the exclusion of all others.[11]  (Doc. No. 54 at 4).

This subsection provides:

> Information from national crime information databases consisting of identification records, criminal history records, protection orders, and wanted person records may be disseminated to civil or criminal courts for use in domestic violence or stalking cases. Nothing *in this subsection* shall be construed to permit access to such records for any other purpose.

28 U.S.C. § 34(f)(1) (emphasis added).

"This [language] simply means that nothing in *subsection (f)* permits access to records for any other purpose—not that access is never permitted for other purposes."  *Mathews v. City of Beaumont*, No. 1:11CV268, 2012 WL 12906090, at *4 (E.D. Tex. Mar. 13, 2012) (emphasis in original).  This reading is confirmed elsewhere in the statute.  For example, section (b) states that the "exchange of records and information *authorized by subsection (a)(4) of this section* is subject to cancellation if dissemination is made outside the receiving departments or related agencies[.]" 28 U.S.C. § 536(b) (emphasis added).

Second, the case law cited by the defendants does not support the argument that the plaintiff's NCIC records cannot be disclosed.  The defendants rely on both *Reporters Committee*, 489 U.S. 749 (1989) and *Comm'r of Pub. Safety v. Freedom of Info. Comm'n*, 144 Conn. App. 821, 833, 76 A.3d 185, 192 (2013).  (*See* Doc. No. 54 at 5-6).  *Reporters Committee* involved journalists who sought copies of FBI rap sheets of four members of an alleged crime family pursuant to the federal Freedom of Information Act ("FOIA").  *See Reporters Committee*, 489 U.S. at 757.  The FBI denied the requests citing FOIA's Exemption 7(C).  *Id.*  Exemption 7(C) excludes

---

[11] The defendants' brief states, "Subsection (f)(1) clearly demonstrates that access to NCIC records for any purpose not contained within the [C]ompact is not permitted."  It is not clear from the text how this subsection of § 534 actually relates to the terms of the Compact, which is an entirely separate statute enabling access to NCIC records for entirely different purposes.

from FOIA's reach records or information compiled for law enforcement purposes, "but only to the extent that the production of such [materials] . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). *Id.* at 755–56.  In examining whether rap sheets were covered under Exemption 7(c), the Supreme Court first concluded that "[t]he privacy interest in a rap sheet is substantial." *Id.* at 771.   In so doing, the Court looked, in part, to § 534 and opined that its "careful and limited pattern of authorized rap-sheet disclosure fits the dictionary definition of privacy as involving a restriction of information 'to the use of a particular person or group or class of persons.'" *Id.* at 765 (citation omitted). "Moreover. . . these statutes and regulations, taken as a whole, evidence a congressional intent to protect the privacy of rap-sheet subjects, and a concomitant recognition of the power of compilations to affect personal privacy that outstrips the combined power of the bits of information contained within." *Id.* Ultimately, the Court held that, categorically balancing the public interest in disclosure against the interest Congress intended the Exemption to protect, "a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy, and that when the request seeks no 'official information' about a Government agency, but merely records that the Government happens to be storing, the invasion of privacy is 'unwarranted.'" *Id.* at 780.    Similarly, *Comm'r of Pub. Safety v. Freedom of Info. Comm'n*, 144 Conn. App. at 824, involved reporters who sought results from inquiries made to the NCIC by the Department of Public Safety pursuant to Connecticut's state FOIA law.  Relying on *Reporters Committee* and its discussion of § 534, that court also ultimately concluded that the records sought by the reporters could not be disclosed pursuant to the state FOIA law. *Id.* at 828-33.

What is clear about both these cases is that they share a concern about the invasion of privacy interests held by citizens in the CHRI records compiled about them by law enforcement

and their potential dissemination to the public (or at least journalists) through FOIA statutes outside of any litigation. This concern is simply not relevant here, where no party has invoked FOIA, and the plaintiff is seeking her *own* NCIC records. *Cf. State v. Avery*, No. CR16284676, 2017 WL 6273543, at *2 (Conn. Super. Ct. Aug. 16, 2017) (finding "these two cases lend support to the view that 28 U.S.C. § 534 and [the Compact] concern the protection of the confidentiality of the reports and limiting disclosure outside of the criminal justice system and official governmental purposes, rather than prohibiting criminal defendants from receiving copies of their rap sheets or other criminal history records"). *See also Golden Pac. Bancorp v. F.D.I.C.*, No. 95 CIV. 9281 (NRB), 2002 WL 31875395, at *5 (S.D.N.Y. Dec. 26, 2002), *aff'd sub nom. Golden Pac. Bancorp. v. F.D.I.C.*, 375 F.3d 196 (2d Cir. 2004) ("Though we recognize that a state court's interpretation of federal law is not binding . . . we nevertheless find the reasoning of the [state] Court . . . persuasive, and adopt it here.").

Lastly, the defendants raise the concern that disclosing five pages of NCIC records—only one of which potentially contains CHRI—may result in Connecticut being terminated from the Compact pursuant to § 534. (*See* Doc. No. 54 at 5-6). To be sure, this Court respects the implications that cancellation from the Compact may have on both noncriminal justice activities governed by the Compact and law enforcement efforts in Connecticut generally. *See also King v. Conde*, 121 F.R.D. 180, 190 (E.D.N.Y. 1988) ("[A] strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy.").

However, the Court notes that, this provision is discretionary and only triggered when such records have been "disseminated" outside the receiving departments or related agencies. 28 U.S.C. § 534(b). Given that disclosure here should be limited to the plaintiff and her attorney and subject

to a standard protective order, disclosure here and in this manner would not count as "dissemination" triggering § 536(b), as that word has been understood both by the DOJ's Office of Legal Counsel ("OLC") [12] in an opinion addressed to the Director of the FBI (the "OLC Opinion") and the Supreme Court in *Reporter's Committee*.

In relevant part, the OLC Opinion discussed whether the cancellation provision of § 534 provided an absolute bar to potentially allowing government-authorized private contractors to access CHRI data.   *See* ACCESS TO CRIM. HIST. RECS. BY NON-GOVERNMENTAL ENTITIES PERFORMING AUTHORIZED CRIM. JUST. FUNCTIONS, 22 U.S. Op. Off. Legal Counsel 119, 1998 WL 1751073 (1998). [13]  As to the term "dissemination," the OLC Opinion stated that:

> a strong argument can be made that disclosures of the sort contemplated would not constitute "dissemination" of the information, within the ordinary meaning of that word. Indeed, the dictionary defines "dissemination" to mean "to spread or send out freely or widely as though sowing or strewing seed: make widespread." Webster's Third International Dictionary 656 (1986). Sharing information with contractors who are assisting in law enforcement and who are subject to carefully drawn controls would not appear to fall within this definition. Moreover, although the meaning of the phrase "dissemination" may well vary based on context.

OLC Opinion, 1998 WL 1751073 * 3.

---

[12] The Office of Legal Counsel, or OLC, is an office within the U.S. Department of Justice that drafts legal opinions of the Attorney General and provides its own written opinions and other advice in response to requests from various agencies within the executive branch.  *See* 28 U.S.C. § 512 (providing that agency heads may seek legal advice from the Attorney General); 28 C.F.R. § 0.25 (delegating Attorney General's authority to render legal advice to OLC); "Office of Legal Counsel," The United States Department of Justice, https://www.justice.gov/olc.

[13] While OLC opinions are not binding on this Court, the OLC Opinion is detailed and thoroughly well-reasoned, and its conclusion advocating for recommending rulemaking was later adopted by the FBI.  The Court thus finds that the OLC Opinion is entitled to significant weight.  *See El Omari v. Int'l Crim. Police Org.*, 35 F.4th 83, 89 (2d Cir. 2022), *cert. denied sub nom. Omari v. Interpol*, No. 22-117, 2022 WL 4654639 (U.S. Oct. 3, 2022) (finding, *inter alia*, an OLC opinion "entitled to considerable persuasive weight" after the executive branch adopted its recommendation and explaining that "the persuasiveness of the Executive Branch's interpretation of statutes outside of the rulemaking context depends, *inter alia*, on 'the thoroughness evident in its consideration' and 'its consistency with earlier and later pronouncements'" (quoting *Gonzales v. Oregon*, 546 U.S. 243, 268-69 (2006)); *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 692 (4th Cir. 2019) ("Although not binding on courts, OLC opinions reflect[ ] the legal position of the executive branch and are generally viewed as providing binding interpretive guidance for executive agencies." (citation and internal quotation marks omitted)).

Similarly, the Supreme Court's understanding of the term in *Reporters Committee* demonstrates that "dissemination" in § 534 is concerned with the availability and broadcast of FBI's CHRI records to the general public.  *See* 489 U.S. at 753 ("Although much rap-sheet information is a matter of public record, the availability and *dissemination* of the actual rap sheet *to the public* is limited.") (emphasis added); *id.* at 767 ("Given this level of federal concern over centralized data bases, the fact that most States *deny the general public access* to their criminal-history summaries should not be surprising.") (emphasis added); *id.* at 771 ("[A]lthough the FBI's policy of granting the subject of a rap sheet access to his own criminal history is consistent with its policy of denying access to all other members of the *general public*") (emphasis added).  *See also Bartnicki v. Vopper*, 532 U.S. 514, 537, 121 S. Ct. 1753, 1766, 149 L. Ed. 2d 787 (2001) (Breyer, J. concurring) ("Media dissemination of an intimate conversation to an entire community will often cause the speakers serious harm over and above the harm caused by an initial disclosure to the person who intercepted the phone call.").  Here, the Court finds that disclosure to the plaintiff (and her counsel) of her own NCIC records does not constitute "dissemination" as contemplated by the § 534(b), which is primarily concerned with public broadcast.

In sum, the Court finds that the defendants have not shouldered their burden to justify curtailing the plaintiff's Rule 26(b) discovery request.  *Huseby, LLC v. Bailey*, No. 3:20-CV-00167 (JBA), 2021 WL 3206776, at \*6.  Rather, as the Supreme Court of West Virginia opined in a similar case examining the potential prohibition by federal regulations on the disclosure of NCIC data sought pursuant to a state discovery statute, "the instant case illustrates, in a particular civil case the contents of a person's criminal history record information may be necessary to the fair resolution of significant issues in the litigation."  *Cf. State ex rel. W. Virginia State Police v. Taylor*,

201 W. Va. 554, 565, 499 S.E.2d 283, 294 (1997).[14]  "In such a case, substantial injustice and unfairness might result from making potentially crucial information unavailable to litigants, by imposing an absolute bar on obtaining the information by the use of civil process pursuant to procedures authorized by" Rule 26(b).  *Id.*  Such a conclusion is further confirmed by the potential of a contrary ruling that would "frustrate the important federal interests in broad discovery and truth-seeking and the interest in vindicating important federal substantive policy such as that embodied in section 1983." *King v. Conde*, 121 F.R.D. 180, 187 (E.D.N.Y. 1988) (citing *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958); *Hickman v. Taylor*, 329 U.S. 495, 507, 67 S.Ct. 385, 391, 91 L.Ed. 451 (1947)).

For the reasons just discussed, the Court **GRANTS** the plaintiff's motion to compel Request No. 10.  (Doc. No. 44).  The Court **ORDERS** the defendants to produce the four pages of withheld NCIC records.  The Court also makes clear that its ruling applies only to the four records at issue in this litigation and is decided upon the facts presented to it and that its ruling is not intended to create an opening for any broader requests for NCIC records.

As it does not appear that the Court has entered the District of Connecticut's Standing Protective Order, the parties may want to consider requesting that such an order issue here to ensure that this discovery material is handled properly and not distributed to anyone other than the plaintiff and her counsel.  *See* FED. R. CIV. P. 26(c); *Dorsett v. Cnty. of Nassau*, 800 F. Supp. 2d 453, 457 (E.D.N.Y. 2011), *aff'd sub nom. Newsday LLC v. Cnty. of Nassau*, 730 F.3d 156 (2d Cir. 2013) ("It is well-settled that courts have broad power to enter protective orders under Rule 26(c) that prohibit parties from sharing discovery materials with non-litigants. [S]uch orders are

---

[14]  In the West Virginia case, the court addressed "whether there is an absolute bar to a non-governmental party obtaining criminal history record information about an individual who will not consent to the release of the information by means of a court order enforcing a *subpoena duces tecum* issued in a civil action to a governmental or law enforcement agency." *Taylor*, 201 W. Va. at 562.

typically referred to as 'confidentiality orders'" (citing *AT & T Corp. v. Sprint Corp.*, 407 F.3d 560, 562 (2d Cir.2005)) (affirming and upholding a protective order preventing public dissemination internal report that the plaintiff obtained from the defendant Nassau County Police Department in discovery); *Mercer v. Rovella*, No. 3:16-CV-329 (CSH), 2022 WL 1514918, at *3 (D. Conn. May 12, 2022) ("Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." (citation and internal quotation marks omitted)).

### B.    The Defendants' Disciplinary Records

In their joint status report, the parties stipulated that Interrogatory No. 8 and Request for Production No. 11 required resolution by the Court.[15]  (Doc. No. 74).  However, in the initial briefing on the motion to compel it appears that only Request for Production No. 11 was in dispute. (*See* Doc. Nos. 42-1 at 8-11; 54 at 7-9).  Given that both requests seek the same essential information, the Court will resolve both.

In Interrogatory No. 8, the plaintiff demands that the defendants:

Identify any and all civilian complaints or internal disciplinary proceedings having to do with alleged abuses of your powers as a law enforcement officer, of which you were a subject. As to each such proceeding, state:

a. The substance of any change made against you in each such proceeding;
b. The name and address of each person who brought such charges;
c. The date and outcome of each such proceeding, including the date and nature of any subsequent disciplinary action against you, if any was taken.

---

[15] The joint status report is confusing as it states, "The Parties request the Court rule on Plaintiff's Motion to Compel a response to Interrogatory #8 and Request for Production #8," yet the request for production subsequently cited is No. 11, which is consistent with the parties briefing.  Accordingly, the Court treats this as a scrivener's error and only addresses Interrogatory No. 8 and Request for Production No. 11.

In Request for Production No. 11, the plaintiff seeks

Any and all police records concerning internal disciplinary procedures, regardless of the outcome, to which defendants have been subjected while employed as a police officer.

(Doc. No. 74 at 1-2).

The defendants objected to Interrogatory No. 8 on the grounds that the "request is overly broad and vague in its reference to 'abuses of power' and is not limited to relevant information." (*Id.*).  As to Request for Production No. 11, the defendants objected on the grounds that the request was not limited to relevant information but that the "Defendants agree[d] to respond to this request as limited to disciplinary proceedings involving allegations of misconduct similar to the plaintiff's claims in this case, *i.e.*, false arrest/malicious prosecution" of which there was "None."  (*Id.*).

During the meet and confer process in February 2022, the defendants maintained their objections to these requests as to documents but agreed that they were "willing to provide any responsive records of civilian complaints and disciplinary proceedings that are similar to the claims alleged in the complaint, *i.e.* false arrest, malicious prosecution, and retaliatory prosecution, but nothing beyond that."  (Doc. No. 42-2, at § 7; Doc. No. 54 at 7).  The plaintiff maintains that the defendants' "entire disciplinary records are relevant to Plaintiff's claims and should be produced" and that the "Plaintiff is entitled to review Defendants' entire disciplinary files and determine for herself what is arguably relevant to the allegations in her Complaint."  (Doc. No. 42-2 at 8, 10). The plaintiff also argues that disciplinary records that are indicative of the defendants' veracity or truthfulness are also relevant and should be produced.  (*Id.* at 9, 11).

As an initial matter, the Court agrees that the defendants' disciplinary records may be relevant to the claims raised here, and thus discoverable, on the theory that they may be used to prove the defendants' intent.  (Doc. No. 42-1 at 8-9).  FED. R. CIV. P. 404(b)(2) (evidence of "other,

crime, wrong, or act . . . may be admissible for another purpose, such as proving . . . intent."). *See Frails v. City of New York*, 236 F.R.D. 116, 117 (E.D.N.Y. 2006) (finding the plaintiff "correct as to his []theory" that the "records of unsubstantiated allegations of misconduct are discoverable under" are relevant "to prove defendants' intent" under FED. R. CIV. P. 404(b)(2)); *Fountain v. City of New York*, No. 03 CIV. 4526 (RWS), 2004 WL 941242, at *2 (S.D.N.Y. May 3, 2004), *on reconsideration in part*, No. 03 CIV 7790 RWS, 2004 WL 1474695 (S.D.N.Y. June 30, 2004). Additionally, courts in this Circuit have also found that disciplinary records and complaints involving allegations of "direct dishonesty" of the defendant in police misconduct actions are relevant. *Saavedra v. City of New York,* No. 19 CIV. 7491 (JPC), 2021 WL 104057, at *2 (S.D.N.Y. Jan. 12, 2021) (in false arrest case against police officers, "[t]he Court [] cho[se] to follow the 'prevailing practice' of courts in this Circuit and limit discovery to complaints that are similar in nature to the allegations in the Complaint or that directly involve dishonesty."). *See Younger v. City of New York*, No. 03 Civ. 8985 (VM) (MHD), 2006 WL 1206489, at *1 (S.D.N.Y. May 2, 2006) (holding in excessive force case that "complaints or disciplinary charges that do not involve the type of misconduct at issue here. . . or acts that involve some element of dishonesty are not likely to be relevant to the claims or defenses in this case, and therefore documents pertaining to such complaints or charges need not be produced").

What is clear, though, is that the "longstanding 'prevailing practice' of courts throughout the Second Circuit is to 'limit discovery of a defendant's disciplinary history to complaints, whether substantiated or not, about conduct *similar to the conduct alleged in the complaint*.'" *Saavedra*, 2021 WL 104057, at *1 (quoting *Gibbs v. City of New York*, No. 06 Civ. 5112 (ILG) (VVP), 2008 WL 314358, at *1 (E.D.N.Y. Feb. 4, 2008)) (emphasis added); *accord Session v. Rodriguez*, No. 3:03CV0943 (AWT), 2008 WL 2338123, at *2 (D. Conn. June 4, 2008). *See*

*Gibbs*, 243 F.R.D. at 96 (S.D.N.Y. 2007) ("[A]ny proceeding-whether administrative, civil or criminal-in which one of the defendants was *charged with or investigated for* possible abuses *of the type alleged* by plaintiff could yield relevant information[.]" (emphasis in original) (citation omitted)); *Frails,* 236 F.R.D. at 118 ("Accordingly, defendants are hereby ordered to produce all CCRB, IAB, and NYPD records of both substantiated and unsubstantiated complaints of misconduct against the defendant police officers *of a similar nature to the claims in the complaint.*") (collecting cases); *Harnage v. S. Barrone*, No. 3:15CV01035(AWT), 2017 WL 3448543, at *6 (D. Conn. Aug. 11, 2017) ("Generally, in a section 1983 case such as this, '[d]isciplinary records involving complaints of a similar nature, whether substantiated or unsubstantiated, could lead to evidence that would be admissible at trial and thus, are discoverable.'" (quoting *Frails,* 236 F.R.D. at 117-18)).  *Cf. Reyes ex rel. Reyes v. City of New York*, No. 00 Civ. 2300 (SHS), 2000 WL 1528239, at *1 (S.D.N.Y. Oct. 16, 2000) (explaining that where New York City Civilian Complaint Review Board ("CCRB") records "contain allegations wholly unrelated to those in the complaint, their relevance has been found to be too tenuous to allow discovery" (internal quotations and citation omitted)).

Thus, as currently framed, Interrogatory 8 is overly broad as it is not properly limited in temporal scope and potentially seeks the identification of every complaint relating to "alleged abuses of power" made against each defendant since the beginning of time.  *See Harnage*, No. 3:15CV01035(AWT), 2017 WL 3448543, at *6.  Accordingly, the Court **sustains**, in part, the defendants' objection to Interrogatory 8 on the grounds of relevance and over breadth.  However, the Court will **GRANT, in limited part**, the plaintiff's motion to compel as to Interrogatory 8.

Specifically, the defendants shall answer Interrogatory No. 8 but only as to any and all civilian complaints or internal disciplinary proceedings against the defendants "of a similar

nature to the claims in the complaint," that is having to do with alleged false arrest, malicious prosecution, and retaliatory prosecution or complaints that involve "direct dishonesty." The plaintiff is entitled to discovery of records and answers to the interrogatory "concerning allegations of a similar nature." *Saavedra v. City of New York,* No. 19 CIV. 7491 (JPC), 2021 WL 104057, at *3 (S.D.N.Y. Jan. 12, 2021) (citing *Reyes*, 2000 WL 1528239, at *2). "This does not mean 'only complaints that are identically labeled' as the allegations in the" Second Amended Complaint. *Id.* (citation omitted). The answers shall include the date and outcome of any identified grievance, complaint, or disciplinary proceeding and only detail such incidents that occurred during their time as police officers.

For the same reasons, Court will **GRANT, in limited part**, the plaintiff's motion to compel as to Request for Production No. 11. The defendants shall produce the police records concerning internal disciplinary procedures, regardless of the outcome, but only to the extent they involve claims of false arrest, malicious prosecution, and retaliatory prosecution or involve "direct dishonesty."

Any privacy concerns by the defendants "can be alleviated by an appropriate protective order and the redaction of personal information (like the officers' addresses and social security numbers) from the reports." *Gibbs*, 243 F.R.D. 95, 96 (S.D.N.Y. 2007). *See* FED. R. CIV. P. 26(c).

## IV.     CONCLUSION

In summary and for the reasons set forth above:

1. The plaintiff's motion to quash, (Doc. No. 37), is **DISMISSED as moot**;

2. The plaintiff's motion to compel, (Doc. No. 42), is **GRANTED in part** subject to following limitations:

   a. Within 14 days of this Order, the defendants shall produce the four pages of NCIC records concerning the plaintiff that are currently being withheld;

b.  Within 30 days of this Order, and as to each defendant, the defendants shall answer Interrogatory No. 8 and identify any and all civilian complaints or internal disciplinary proceedings having to do with alleged complaints of false arrest, malicious prosecution, retaliatory prosecution, or direct dishonesty during their employment as police officers.

c.  Within 30 days of this Order, and as to each defendant, the defendants shall produce documents responsive to Request for Production No. 11, *i.e.*, any and all police records concerning internal disciplinary procedures, regardless of the outcome, to which defendants have been subjected while employed as a police officer, limited to discipline for false arrest, malicious prosecution, retaliatory prosecution, or direct dishonesty.

To the extent that the parties seek entry of the Standing Protective Order, they shall submit a joint request on or before 14 days after the entry of this Order. "The parties are urged to work cooperatively on this issue to eliminate the need for further litigation. If the parties are unable to agree, each may file its own request by that date, including both a proposed order for the court's endorsement and a memorandum of law citing authority in support of its position." *Session v. Rodriguez*, No. 3:03CV0943 (AWT), 2008 WL 2338123, at *3 (D. Conn. June 4, 2008).

This is not a Recommended Ruling. This Ruling is reviewable pursuant to the "clearly erroneous" statutory standard of review. *See* 28 U.S.C. § 636(b)(1)(A); FED. R. CIV. P. 72(a); and D. CONN. L. CIV. R. 72.2. As such, it is an order of the Court unless reversed or modified by the district judge upon timely made objection.

Dated at New Haven, Connecticut, this 17th day of November, 2022.

     /s/ Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge